IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONICA HARRIS<br><br>        Plaintiff,<br><br>   v.<br><br>MICHAEL ASTRUE, COMMISSIONER OF SOCIAL SECURITY<br><br>        Defendant. | No. CV 07-04626 EDL<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT** |

**INTRODUCTION**

Plaintiff Monica Harris ("Plaintiff") brought this action pursuant to 42 U.S.C. § 1383(c) challenging the final decision of the Commissioner of Social Security denying her claim. Specifically, Plaintiff alleges that the Administrative Law Judge's ("ALJ") decision that she did not suffer from a severe medically determinable physical impairment that significantly limited her ability to perform basic work-related activities for twelve consecutive months was not supported by substantial evidence and was based on legal error. Plaintiff requests that the Court reverse the decision of the ALJ and award benefits or, in the alternative, remand the matter to cure the legal defects. Defendant filed a cross-motion for summary judgment, seeking affirmance of the ALJ's decision. For the reasons discussed below, the Court grants in part and denies in part Plaintiff's motion for summary judgment and Defendant's cross-motion for summary judgment.

**PROCEDURAL BACKGROUND**

On August 27, 2004, Plaintiff Monica Harris filed an application for Disability Insurance Benefits under Title II of the Social Security Act, alleging disability as a result of right carpal tunnel

syndrome status post decompression, right wrist and forearm tenosynovitis, and capsulitis debriedments. (A.R. 15). The Social Security Administration ("SSA") denied Plaintiff's application initially and on reconsideration on February 2, 2005. (A.R. 31). After a hearing on May 11, 2006, ALJ Steven Berlin issued an unfavorable decision on September 25, 2006. (A.R. 18). The ALJ found that Plaintiff could have worked within the twelve month period for which she claimed disability, and therefore failed to meet the durational requirement. The SSA Appeals Council denied Plaintiff's request for review on April 25, 2007, making the ALJ's decision final. (AR 5-7). On September 7, 2007, Plaintiff filed this suit in federal court.

On April 24, 2008, Plaintiff filed a motion for summary judgment and/or remand challenging the final decision of Defendant Commissioner of Social Security ("Defendant"). Plaintiff contends that: (1) the ALJ failed to properly evaluate the medical evidence of record and, therefore, his decision lacks the support of substantial evidence, and (2) the ALJ committed a legal error in relying on vocational testimony based upon inaccurate hypotheticals. On May 23, 2008, Defendant Michael J. Astrue, Commissioner of Social Security, filed a cross-motion for summary judgment and for affirmance of the Commissioner's final decision. On June 7, 2008, Plaintiff filed a reply. The Court then took this matter under submission without oral argument.

**FACTUAL BACKGROUND**

Plaintiff was born in Oakland, California, in 1964, and was thirty-nine years old when she developed right carpal tunnel syndrome, tenosynovitis, and tendinitis at her job as a dental surgery assistant employed by University of California San Francisco ("UCSF"). (A.R. 204-05). Plaintiff's medical records contain the following information. On February 13, 2004, Plaintiff went to the emergency room for acute onset of pain in her right wrist and thumb that developed after assisting in a four-hour dental surgery. (A.R. 138). She was diagnosed with wrist strain, for which she pursued conservative care, including immobilizing her wrist in a splint and taking Ibuprofen and Aleve. (A.R. 139, 170-71, 175). She worked under modified conditions, as a file clerk at the UCSF clinic, for one month. (A.R. 172). Her condition did not improve and she developed symptoms in her left arm and shoulder, so she was unable to continue in that capacity. Her last day of work at that time was March 19, 2004. Id.

1        Plaintiff had no previous upper extremity injuries or workers' compensation claims. (A.R.
2   205). She has diabetes which she controls by diet, and had a mild heart attack one month prior to
3   her injury. Hand specialist Dr. Stein suggested that the heart attack may have played a role in
4   causing her wrist condition (A.R. 171-72), but her treating doctor, Dr. Wren, disputed this (A.R.
5   228). Dr. Wren found that Plaintiff's impairment was definitely related to the incident at work in
6   February 2004. Id.

7        Plaintiff completed six weeks of hand therapy, which she felt did not benefit her. (A.R. 175).
8   On May 13, 2004, Plaintiff reported constant numbness and tingling in her right thumb, index, and
9   middle fingers, constant swelling in the right hand and fingers, and pain, numbness, and tingling into
10  the forearm up to the elbow. (A.R. 174). At that appointment, Dr. Wren noted Plaintiff's weakened
11  ability to grip (A.R. 177) and reported that he suspected carpal tunnel syndrome, for which he
12  referred her for further assessment. He recorded that Plaintiff remained disabled from her usual and
13  customary employment, and released her back to modified work. (A.R. 180). On June 18, 2004, an
14  MRI revealed a ganglion cyst in Plaintiff's right wrist. (A.R. 206). On June 23, 2004, an
15  electrodiagnostic study informed Dr. Bhattacharyya's diagnosis of mild carpal tunnel syndrome.
16  (A.R. 206).

17       On July 1, 2004, Dr. Wren stated a plan for surgery and allowed Plaintiff to return to work
18  with restrictions that she "use right hand as tolerated. No forceful use, power gripping, lifting,
19  forceful pulling [or] pushing with right hand." (A.R. 169). He also specified, "if modified duty not
20  available patient should be paid disability pay." Id. It is disputed whether Plaintiff returned to work
21  with modified duties on July 1, 2004. See Pl.'s Mot. for Summ. J. at 5:17-23. Dr. Gordon stated
22  that she returned to work in his report dated May 6, 2005, (A.R. 206), and the ALJ mentioned in his
23  decision that she returned to work, although he noted that whether or not she did so did not affect the
24  analysis. (A.R. 16-17). Plaintiff maintains that Dr. Gordon simply referenced a report from Dr.
25  Wren that Plaintiff could return to modified duties on July 6, 2004 (A.R. 209), but that she never did
26  so. There is no other evidence that Plaintiff returned to work in July, 2004, and Dr. Wren did not
27  mention any return to work in his "Comprehensive Residual Disability Evaluation Report by
28  Treating Physician" on May 5, 2005 (A.R. 233-38).

3

When her condition did not improve after this conservative care, modified work duties and a leave from work, on August 11, 2004, Dr. Wren performed wrist surgery. (A.R. 223). Plaintiff had more than twenty follow-up visits following surgery. (A.R. 206). Plaintiff complained of ongoing stiffness and pain, and Dr. Wren made objective findings of weak grip strength and range of motion, with gradual improvement and responsiveness to treatment over time. (A.R. 246, 244, 240).

On January 10, 2005, Dr. Wren released Plaintiff to return to modified work after ten months of no work with the following restrictions: "Zero keyboarding, zero fine manipulation, no torquing, gripping, grasping, pulling with right upper extremity." (A.R. 246). Plaintiff's employer did not respond to Plaintiff's request for modification. (A.R. 267) ("I literally begged, can you let me sit at the front desk, can I just pick up the phone with one hand. And they could not accommodate me. . . . I looked for different opportunities within UC . . . but unfortunately there was nothing they could accommodate me with."). On February 2, 2005, in response to a Human Resources Disability Management request, Dr. Wren stated that Plaintiff would be precluded from aspects of the job involving firm gripping, pulling forcefully, heavy lifting, or power torquing, and projected that Plaintiff would be able to return to work by June 1, 2005. (A.R. 241-42). On February 10, 2005, Dr. Wren modified the limitations to no forceful gripping, torquing, or lifting over 2 pounds, writing for over two minutes at a time, or computer keyboarding over five minutes at a time; he also prescribed a paraffin wax treatment. (A.R. 244). Plaintiff's employer did not accommodate Plaintiff. (A.R. 270). On March 5, 2005, Dr. Wren repeated his modified restrictions from February 10, 2005, noting that treatment had been effective and that Plaintiff noticed a slight improvement in her range of motion. (A.R. 240-41).

On May 5, 2005, Dr. Wren released Plaintiff to work at her usual job starting May 9, 2005, noting that she had improved over the past two months. (A.R. 232). Plaintiff returned for a scheduled follow-up appointment on May 26, 2005, at which Dr. Wren instructed her to return to modified work with the following restrictions: no use of her right hand for traction, power gripping, torquing for over one and a half hours at a time, and allowing her a five to ten minute break from her right hand before resuming. (A.R. 231). Plaintiff's employer accommodated these restrictions and Plaintiff returned to work. On July 29, 2005, Dr. Wren lifted all restrictions on Plaintiff's work

4

though he continued to monitor her progress. (A.R. 222). During Plaintiff's follow-up visits in the next seven months after her return to work, Dr. Wren continued to make objective findings that Plaintiff had reduced motion and grip strength and that Plaintiff complained of pain and numbness. (A.R. 220, Dec. 22, 2005; A.R. 221, Nov. 17, 2005; A.R. 222, Aug. 19, 2005). Plaintiff continues to work at the UCSF Dental Clinic. In order to reduce pain and swelling, she wears an edema glove and wrist split at work when she is able to do so. (A.R. 247, 268-9)

**LEGAL STANDARD**

Pursuant to 42 U.S.C. § 405(g), the Court's jurisdiction is limited to the question of whether the findings of fact in the decision are supported by substantial evidence or were based on legal error. 42 U.S.C. § 405(g); Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir. 1992). Substantial evidence is "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." See Richardson v. Perales, 402 U.S. 389, 401 (1971); Sandgathe v. Chater 108 F.3d 978, 980 (9th Cir. 1997); Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).

To determine whether substantial evidence supports the ALJ's decision, the Court reviews the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion. Id. "A trier of fact, not the reviewing Court, must resolve conflicts in the evidence, and if the evidence can support either outcome, the Court may not substitute its judgment for that of the ALJ." Matney v. Sullivan, 981 F.2d at 1019.

**A. Definition and Determination of Disability**

To qualify for disability insurance benefits, Plaintiff must demonstrate that she is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment, which can be expected to result in death or last for a continuous period of at least twelve months. See 42 U.S.C. § 423(d)(1)(A). An impairment or combination of impairments may be found not severe "only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work." Webb v. Barnhart, 433 F.3d 683, 686-87 (9th Cir. 2005).

The SSA uses a five-step sequential evaluation process to determine whether a claimant is

disabled. See 20 C.F.R. 416.920; see also Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998). First, the SSA determines whether the claimant is engaged in substantial gainful activity. See 20 C.F.R. 416.920(a)(4). Here, the ALJ determined that Plaintiff did not engage in substantial gainful activity from March 19, 2004, through May 8, 2005. (A.R. 15). If the claimant did not engage in substantial gainful activity, the SSA proceeds to step two to determine whether the claimant has a "severe medically determinable physical or mental impairment" that has lasted or is expected to last for at least twelve months or result in death. See id.; 20 C.F.R. 416.909. The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." Webb, 433 F.3d at 686, (citing 20 C.F.R. § 404.1521(b)). An impairment or combination of impairments may be found not severe only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work or has not significantly limited the claimant's ability to perform basic work-related activities for twelve consecutive months. Id. at 687 (citation omitted); A.R. 16 (citing 20 CFR 404.1521: SSR 82-52). If claimant is found to have a severe impairment, the SSA proceeds to step three to determine whether the impairment is equivalent to one of a number of listed impairments whose level of severity establishes disability. 20 C.F.R. 416.920(a)(4). The SSA presumes that a claimant is disabled if his impairment meets or equals one of the listings. Id.

If the claimant's impairment does not meet or equal one of the listings, the SSA proceeds to step four to determine the claimant's residual functional capacity, that is, what work activities the claimant can still perform despite the impairments. Id. The SSA considers the claimant not disabled if he or she is able to perform his past work. Id. If the claimant cannot perform his past work, the SSA proceeds to step five to determine whether the claimant can perform other work, considering claimant's age, education and work experience. 20 C.F.R. 415.920(g). If the claimant cannot perform other work, the SSA finds him disabled. Id. The claimant has the burden of proving that she is disabled. A claimant establishes a prima facie case of disability by showing that her impairment prevents her from performing her previous occupation. Once claimant has done so, however, the burden shifts to the Commissioner to show that claimant can perform other work under step five of the analysis. Smolen v. Chater, 80 F.3d 1273, 1289 (9th Cir. 1996).

**B. Final ALJ Decision**

In his final decision, the ALJ concluded that "there [had] never been an impairment or combination of impairments of such severity as to preclude the claimant's engaging in substantial gainful activity for a continuous period of 12 months." (A.R. 18). Under step two of the SSA sequential evaluation process, the ALJ found that from March 22, 2004 to May 8, 2005, Plaintiff did not have a medically severe impairment that significantly limited her abilities to do basic work activities, and therefore failed to meet the durational requirement. Specifically, the ALJ found that the Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that "[Plaintiff's] statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible for the entire alleged closed period." (A.R. 17). The ALJ supported his opinion with Dr. Wren's progress report dated January 10, 2005, with instructions to return to work with the limitation of no fine manipulation, keyboarding, gripping, grasping or pulling with her right hand. (A.R. 246). The ALJ added that, under step three, Plaintiff's impairments do not approach in severity the requirements of any medical condition described in the Listing of Impairments. (A.R. 16). Under steps four and five, the ALJ concluded that although Plaintiff could not have performed her past relevant work between January 11 and March 19, 2005, according to a vocational expert, she could have performed other work. (A.R. 17).

The ALJ posed five hypothetical medical conditions to the vocational expert and asked if a person with those limitations could perform Plaintiff's past work or jobs that exist in the national economy. First, the ALJ posed a hypothetical that included an inability to make forceful use of the dominant hand for lifting, pulling or pushing. (A.R. 274). This hypothetical did not match any of the limitations Dr. Wren imposed at any time. The vocational expert stated that the past work of dental assistant could be performed because it is not a forceful upper extremity position. (A.R. 274-275). The second hypothetical restriction was no forceful use of the dominant hand or wrist, such as power gripping, lifting, pulling or pushing. This hypothetical resembled limitations Dr. Wren imposed on July 8, 2004, (A.R. 168) prior to Plaintiff's surgery, but omitted the subjective, pain-informed restrictions he imposed the week before, on July 1, 2004: "Use of right hand as tolerated." (A.R. 169). The vocational expert again stated that past work of dental assistant could be performed.

7

(A.R. 275).

The third hypothetical assumed "that the person cannot do any keyboarding, and cannot do ongoing grasping or pulling with the dominant upper extremity, and can do no fine manipulation." (A.R. 275). These restrictions matched limitations Dr. Wren imposed on January 10, 2005. (A.R. 246). The vocational expert stated that a person with those restrictions would not be able to do the work of a dental assistant. (A.R. 275). When the ALJ asked whether a person with those restrictions would be able to perform other jobs in the national economy, the vocational expert initially replied "Probably not . . . I mean you're looking at zero handedness, essentially." (A.R. 278-79). The ALJ asked if there were jobs for a person who can use their non-dominant upper extremity and the vocational expert replied, "Well, yeah. Theoretically, in that particular case she could potentially, for example, do sedentary, unskilled receptionist positions." (A.R. 279). The expert added that 3,000 to 4,000 such jobs exist in the regional economy, and added that the position of information clerk is similar, for which there are 3,000 to 4,000 such jobs in the region. The ALJ asked for another example and the expert added security guard, noting that such a position had greater physical demands. (A.R. 279). During the interview, Plaintiff's attorney inquired as to what percentage of these jobs would require writing or computer use, to which the expert replied about fifty percent. (A.R. 281). Plaintiff's attorney added that Plaintiff's pain and discomfort must also be considered. Id. The ALJ replied that pain had already been factored into the functional limitation (A.R. 283).

The ALJ posed a fourth hypothetical that resembled Dr. Wren's limitations on February 10, 2005 which restricted lifting to under two pounds, writing to two minutes at a time, and continued to prohibit forceful gripping, torquing, and computer use. (A.R. 275-76, 244). The expert stated that such limitations would prevent a person from performing the work of a dental assistant. (A.R. 276). The fifth hypothetical permitted lifting up to twenty pounds and restricted the frequency of gross manipulation such as pushing and pulling. These restrictions matched the "Physical Residual Functional Capacity Assessment" performed on September 29, 2004 by Dr. Mathur. (A.R. 182-189). The expert stated that such restrictions would permit working as a dental assistant.

The ALJ relied on the vocational expert's testimony in response to his third hypothetical in

finding that Plaintiff could have worked as a receptionist (3,000 jobs regionally), and information clerk (3,000 jobs regionally), or a security guard (5,000 jobs) as of January 11, 2005, although she could not return to her past job. Id. The ALJ also relied on the vocational expert's testimony in his finding that, as of March 3, 2005, Plaintiff could have done her past relevant work as she performed it. (A.R. 18). Therefore, because the twelve month period began on March 19, 2004, Plaintiff's last day of work, Plaintiff did not satisfy the durational requirement.

**LEGAL ANALYSIS**

**1. The ALJ erred by failing to comply with Social Security Ruling 00-4p**

Initially, Plaintiff contends that the ALJ erred in finding that she failed to meet the durational requirement. The burden is on the claimant to demonstrate that the impairment was expected to result in death or to last for a continuous period of at least twelve months. Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1987). Here, substantial evidence existed for the ALJ to find that the medical evidence clearly established that Plaintiff did not have a medically severe impairment or combination of impairments. The ALJ found that because Dr. Wren released Plaintiff to work on January 10, 2005, with significant modifications, she did not meet the durational requirement. (A.R. 17).

Plaintiff contends that because the ALJ erred in evaluating the medical evidence, he erred in his determination that she failed to meet the durational requirement. See Pl.'s Mot. at 3. Plaintiff maintains that the abundant medical evidence demonstrated that she satisfied the durational requirement. See Pl.'s Mot. 4-6. Plaintiff did not return to work following Dr. Wren's January 10, 2005 release because her employer would not accommodate her limitations. The standard for disability and the durational requirement, however, is not whether Plaintiff could have performed her past work, but rather any work at all. In making that determination, for which the Commissioner has the burden, the ALJ may consult with a vocational expert, and using hypotheticals, address whether the claimant can perform other substantial gainful work that exists in the national economy. See Silveira v. Apfel, 204 F.3d 1257, 1259 (9th Cir. 2000); see also Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995) ("without other reliable evidence of a claimant's ability to perform specific jobs, the Secretary must use a vocational expert to meet that burden"); Embrey v. Bowen,

9

849 F.2d 418, 422 (9th Cir. 1988) (quoting Gamer v. Secretary of Health and Human Services, 815 F.2d 1275, 1278 (9th Cir. 1987).

Here, the ALJ properly posed a complete and accurate hypothetical for the period of time at issue. Hypothetical questions posed to the vocational expert must set out all the limitations and restrictions of the particular claimant, including, for example, pain and an inability to lift certain weights. See Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988) (remanding the case because the ALJ relied on a vocational expert's opinion that had no support in the record and was flatly contradicted by the plaintiff's and his doctors' testimony) (quoting Gamer v. Secretary of Health and Human Services, 815 F.2d 1275, 1278 (9th Cir. 1987). In contrast to Embrey and Gamer, the third hypothetical the ALJ posed to the vocational expert matches Dr. Wren's work modifications on January 10, 2005, except for the prohibition against torquing. However, the failure to include torquing in the hypothetical is harmless in light of Plaintiff's acknowledgement that the third hypothetical "encompasses the limitations imposed by Dr. Wren as of January 10, 2005." Pl.'s Mot. at 8. Therefore, this hypothetical was proper.

Through the vocational expert, the ALJ identified several jobs, including security guard, receptionist and information clerk, that Plaintiff could have performed with her limitations. Plaintiff does not argue that the job of security guard is incompatible with her limitations. Relying on the DOT, however, Plaintiff argues that there are no sedentary, unskilled receptionist or information clerk jobs and no light unskilled security guard occupations. See Pl.'s Mot. at 8, Ex. 1. In response, Defendant points out that the DOT is not an exhaustive list of occupations in the United States. See Johnson v. Shalala, 60 F.3d 1428, 1435 (9th Cir. 1995) ("the DOT itself states that it is not comprehensive"). Defendant also shows that the DOT contains a job description for telephone quotation clerk that is consistent with the vocational expert's testimony and for which the vocational expert identified 3,500 jobs Plaintiff could perform with her physical limitations. See Def.'s Opp'n at 4, Ex. 1. Plaintiff, however, argues that the occupation of information clerk or telephone quotation clerk requires frequent fingering, handling and reaching, all of which are incompatible with her limitations. See Pl.'s Reply at 4.

10

1    Where a vocational expert's testimony conflicts with the DOT, the ALJ must elicit a
2 reasonable explanation for the conflict before relying on the testimony to support a determination or
3 decision about whether the claimant is disabled. See SSR 00-4p, 2000 WL 1898704 (S.S.A.).
4 Neither the DOT nor the expert's testimony automatically "trumps" when there is a conflict; the
5 adjudicator must determine which is more reasonable. Id.  Further, an ALJ may not rely on a
6 vocational expert's testimony regarding the requirements of a particular job without first inquiring
7 whether the testimony conflicts with the DOT. See Massachi v. Astrue, 486 F.3d 1149, 1154 (9th
8 Cir. 2007). Massachi's holding is consistent with the earlier ruling by the SSA in December 2000,
9 Policy Interpretation Ruling SSR 00-4p, which unambiguously provides that "when a [vocational
10 expert] . . . provides evidence about the requirements of a job or occupation, the adjudicator has an
11 affirmative responsibility to ask about any possible conflict between that [vocational expert] . . .
12 evidence and information provided in the [Dictionary of Occupational Titles]," and further provides
13 that the adjudicator "will ask" the vocational expert "if the evidence he or she has provided" is
14 consistent with the DOT and obtain a reasonable explanation for any apparent conflict. See SSR 00-
15 4p at 4, available at 2000 WL 1898704; see also Avenetti v. Barnhart, 456 F.3d 1122, 1124 (9th Cir.
16 2006) ("[Social Security Rulings] reflect the official interpretation of the [Social Security
17 Administration] and are entitled to 'some deference' as long as they are consistent with the Social
18 Security Act and Regulations.").
19    Here, the ALJ asked the vocational expert to elaborate on the specific job requirements about
20 which the expert testified, but failed to directly and explicitly ask whether a conflict existed between
21 any of the jobs identified by the vocational expert and the DOT. Accordingly, the ALJ erred in
22 failing to comply with SSR 00-4p. This matter shall be remanded on this issue.
23 **2. ALJ did not err in treatment of Plaintiff's subjective complaints**
24    The ALJ properly considered Plaintiff's subjective complaints in his determination.
25 Although Plaintiff contends that the ALJ erred in dismissing her subjective complaints as not
26 credible, this is not a case where the ALJ deemed a claimant fit to work in contradiction to
27 uncontroverted evidence. See, e.g., Perminter v. Heckler, 765 F.2d 870, 871 (9th Cir. 1985)
28 (holding that the ALJ erred in denying benefits based on observation in the face of medical reports

11

documenting excruciating pain). An adjudicator may not discredit a claimant's testimony of pain and deny disability benefits solely because the degree of pain alleged by the claimant is not supported by objective medical evidence. Bunnell v. Sullivan, 947 F.2d 341, 347 (9th Cir. 1991) (overruling decisions in which ALJs rejected plaintiffs' testimony of severe, constant, disabling pain on the basis that their testimonies were not fully credible and did not establish the existence of disabling pain in light of medical evidence). Here, in contrast to Bunnell, the ALJ did not reject Plaintiff's statements; rather, the ALJ found Plaintiff's statements regarding her pain "not entirely credible for the entire alleged closed period." The ALJ relied primarily on Dr. Wren's progress reports in formulating his hypotheticals, and those progress reports documented Plaintiff's subjective complaints. Plaintiff does not allege that her pain was more severe or disabling than Dr. Wren reported. Since Dr. Wren had released Plaintiff to return to work with modifications and Plaintiff does not dispute this release, the ALJ's explanation is supported by substantial evidence.

Plaintiff contends that because the ALJ's disbelief of Plaintiff's statements of pain were a crucial factor to his decision, the ALJ must make an explicit, full and detailed finding as to Plaintiff's credibility. See, e.g., Albalos v. Sullivan, 907 F.2d 871, 873-74 (9th Cir. 1990) (rejecting ALJ's decision that neither expressly discredited claimant's testimony nor articulated any reasons for questioning her credibility, and failed to indicate the amount of weight given to items of evidence). In contrast to Albalos, the ALJ here relied primarily on Dr. Wren's evaluations and Dr. Wren's release of Plaintiff to work with modifications, which incorporated her subjective statements of pain. Where there is conflicting evidence, hypothetical questions posed by the ALJ need only be supported by the weight of substantial evidence. See Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987) ("ALJ's hypothetical questions need not include all possible restrictions; they are sufficient if they are supported by substantial evidence."). Because the ALJ's hypotheticals were supported by the substantial evidence of Dr. Wren's reports which included Plaintiff's subjective complaints, the ALJ did not need to make any more detailed findings than he did on Plaintiff's credibility. Therefore, the ALJ did not err in addressing Plaintiffs' subjective complaints.

//

//

//

//

//

**D. Conclusion**

The ALJ erred in failing to comply with SSR 00-4p in his questioning of the vocational expert. For the reasons above, Plaintiff's summary judgment motion and Defendant's cross-motion for summary judgment are granted in part and denied in part, and this matter is remanded to the ALJ as stated in this Order.

**IT IS SO ORDERED.**

Dated: September 3, 2008

_____
ELIZABETH D. LAPORTE
United States Magistrate Judge